[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENTAND DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT
The plaintiff has filed a partial motion for summary judgment claiming that the defendants have breached their duty to defend it in actions brought by the United States Environmental Protection Agency and the Connecticut Department of Environmental Protection. The plaintiff also requests the court to enter a declaratory judgment that the defendant Aetna had a duty to defend Linemaster in these CT Page 8569 ongoing environmental actions.
The defendants oppose the motion for partial summary judgment and have also filed cross motions for summary judgment as to each and every count of the plaintiff's complaint. This decision will discuss in several sections the meaning of "suit" and of "damages" under these Comprehensive Liability Policies, whether there has been "occurrence" under the terms of the policy, the applicability of the so-called pollution exclusion clause and the appropriate interpretation of the personal injury endorsement in the policies. The rules to be applied in summary judgment matters are well known. In this case many of the issues involved are simply questions of law and contract interpretation. There is not so much a dispute as to the facts but disagreement over what set of facts is applicable to the issue being decided. Thus ultimately any decision depends on an interpretation of law.
Introductory observations are appropriate in this case since the matters before the court cannot be resolved by a dry reference to the nuances in an agreed upon body of case law. In the last forty years local, state, and federal authorities have been enacting laws to protect the environment which have increasingly imposed costs on certain industries for damage caused to the environment and for correcting such damage and preventing its recurrence. For the purposes of the present suit, the most important event in this regard was the passage by Congress of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA). This act imposes strict liability on businesses for past hazardous waste disposal activities.
CERCLA liability can reach huge amounts that could destroy a business so companies subject to procedures under the act seek insurance coverage. In doing so, they rely for coverage on their standard form Comprehensive General Liability Insurance Policies (CGL). Insurers have strenuously resisted insureds' attempt to secure such coverage since the enormity of costs under the federal act could financially overwhelm liability insurers.
The battle is joined between these disputing parties on the interpretation of various words and clauses in standard CGL policies. Has the insurer's duty to defend been triggered by the bringing of a "suit" against the insured? Has there CT Page 8570 been an "occurrence" so that coverage must be provided for and how is the definition of "occurrence" affected by the standard "pollution" clause in these policies particularly the "sudden and accidental" language? Are the costs the insured has become obligated to pay "damages" under the terms of the policy which the insurance company is obligated to pay?
All of these issues have been well raised by the parties in this case in over three hundred pages of briefs. It is evident from the briefs and the law review articles read by the court that the underlying dispute has been actively litigated in all the states and federal circuits and in very many, if not most federal district courts. On all of the major issues necessary to a resolution of this dispute there are splits of authority and as to some of the issues there does not even appear to be majority positions.
The rational way to decide these issues would be through industry wide agreements between insureds and insurers. That does not seem feasible since, apart from anti-trust concerns that might be raised, disputing parties would have to come to agreement while enormous claims remain in issue between them. Also, because of the nature of CERCLA remedies, there would be no way at any particular time of accounting for prior environmental damage which has not yet come to light.
The federal legislation could be amended but there does not appear to be the political will or ability to do that. The powerful lobbying efforts that would be mounted by both sides would negate the possibility of any comprehensive solution at best and lead to irrational results at worst. Professor Kenneth Abraham of the Virginia School of Law has suggested retroactive indexing of premiums or the possibility of deregulating high-uncertainty liability insurance[1] but these "solutions" may raise more problems than they seek to remedy.
The difficulty faced by the courts in resolving these disputes and the sometimes disingenuous interpretation of contract language understandably engaged in by both sides in these cases is due to the fact that
 When writing occurrence-based general liability policies decades ago, the insurers did not anticipate that a statute would be enacted some time in the CT Page 8571 future that would create retroactive strict liability with enormous costs for pollution cleanup . . ." Insurance Law and Practice, Appleman, Vol. 7A, page 129 of 1994 Supplement.
Thus apart perhaps from the pollution exclusion clause language developed by the insurance industry and added to the CGL policies in the 1970's[2], the policy language courts and litigants must struggle with was written long before the problem to which it is now sought to be applied was even contemplated.
On the other hand, the stakes are enormous since a particular insured will have to pay huge costs unless there is coverage and the insurance industry fights all the claims because as to these costs as Appleman notes "the insurers did not bargain to cover the risk, did not collect premiums for it, and did not reserve for it"; Appleman, Vol. 7A page 129 of 1994 Supplement. Perhaps more fundamentally CERCLA "makes liability almost inevitable for a risk that is essentially unpredictable in both frequency and size; thus accurate risk assessment, the fundamental requirement for insurance, is impossible for insurers to achieve . . .", id. also see Abraham article at 88 Columbia Law Review 942 at pp. 945-949.
Uncertainty is also anathema to companies, the insureds, who face environmental regulation because of the high risk industrial activity they are often engaged in.
The courts appear to be the only forums available to resolve these uncertainties. But, ironically, the courts are perhaps the worst forums within which to resolve these matters because no matter how right or wrong a particular decision may appear to one or the other party, it only adds to the uncertainty in the area as a whole since there are divergent opinions being issued or already issued all over the country. A particular litigant may achieve certainty but this only adds to the uncertainty generally since insurance companies and often the business and industrial litigants they oppose operate across state lines.
Because of the conflicting considerations, just discussed and the business and regulatory background to this dispute, I will briefly discuss the interpretive principles I will apply in examining the language of this contract as it applies to CT Page 8572 the coverage dispute.
It is, of course, an insurance contract. It has been said that:
 If the terms of an insurance policy are plain and unambiguous, they are to be accorded their natural and ordinary meaning . . . . If they are not, then the construction most favorable to the insured is to be adopted . . . . when the words of an insurance contract are, without violence, susceptible of two interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted.
 Raffel v. Travelers Indemnity Co., 141 Conn. 389, 392
(1954). Also see Beach v. Middlesex Mutual Insurance Co., 205 Conn. 246,249-50 (1987), Fred DeWitt, Jr. v. John Hancock MutualLife Insurance Co., 5 Conn. App. 590, 593-94 (1985), Krevolinv. Dimmich, 39 Conn. Sup. 44, 51 (1983). This principle applies with equal force to so-called exclusion clauses.Smedley Co. v. Employers Mutual Life Ins. Co., 143 Conn. 510,513 (1956), Boon v. Aetna Ins. Co., 40 Conn. 575, 586 (1874). Also see Griswold v. Union labor Life Ins. Co., 186 Conn. 507,512 (1982), Plasticrete Corporation v. American PolicyholdersIns. Co., 184 Conn. 231, 236 (1981). It has been said that the insurance company and its lawyers draw up the policies and thus by the language used they can "more easily prevent mistakes in meaning" so that doubts as to meaning should be resolved against the company. Griswold v. Union Labor LifeIns. Co., 186 Conn. at p. 513, cf Beach v. Middlesex MutualAssurance Co., 205 Conn. at p. 251.
It is also true, however, that no matter who draws up the contract language and no matter how strong the bargaining power of one of the contracting parties is perceived to be, a party, insurance companies included, is entitled to enjoy and rely on the benefits of the contract it negotiated. Thus, inHammer v. Lumberman's Mutual Casualty Co., 214 Conn. 573, 583
(1990) it was said:
 If the words in the policy are plain and unambiguous the established rules for the construction of contracts apply. The language, from which the intention of the CT Page 8573 parties is to be deduced, must be accorded its natural and ordinary meaning, and courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties.
In Downs v. National Casualty Co., 146 Conn. 490, 494-95
(1959) it was phrased in a way even more to the point:
 A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous because lawyers or laymen (sic) contend for different meanings.
In fact as the court said in McGlinchey v. Aetna Casualty Surety Co., 224 Conn. 133, 137 (1992)
 There is no presumption that language in insurance contracts is inherently ambiguous. Only if the language manifests some ambiguity do we apply the rule that ambiguous insurance contracts are to be construed in favor of insureds and to provide coverage.
Where a judge finds ambiguity where none exists, he or she is in effect making the insurance contract instead of the parties.
Such inappropriate judicial activity also occurs when a court, in order to give its own meaning to the policy, fails to construe the contract as a whole.
 A policy is to be taken as a whole, and all its relevant provisions considered in connection with each other . . . . Every provision is to be given effect, if possible, and no word or clause eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it.
 Downs v. National Casualty Co., 146 Conn. at p. 495.
All of the above is helpful to a certain extent but what makes the particular problem before the court extremely difficult to analyze is that when the language of these CGL policies was written the risk that one party wants covered and CT Page 8574 the other seeks to avoid was not even contemplated. Thus it is somewhat strained to apply principles of contract interpretation that purport to enforce the "intent" or "understanding" of the parties.
I think this means that these principles in a case like this cannot be woodenly applied. That is, I believe in cases having these issues the more honest if not often expressed approach should be — given these general principles of insurance policy interpretation what should parties, such as the ones before the court now, reasonably expect to be the meaning of their policy in light of the fact that the policy language was formulated at a time when the scope of the risks it now has to address was not even in existence let alone contemplated.
In analyzing and deciding the issues raised by this particular type of case such an approach might properly induce a court at least to entertain if not accept the heretical notion that the ambiguity principle should not automatically apply against insurance companies where sophisticated parties of fairly equal bargaining power negotiate an insurance policy. First State Underwriters Corp. v. Travelers InsuranceCo., 803 F.2d 1308, 1314 NS (CA3, 1986). In Eagle LeasingCorp. v. Hartford Fire Insurance Co., 504 F.2d 1257, 1260-1261 (CA5, 1976) the court refused to automatically construe an ambiguity against an insurer noting that in the commercial insurance field insureds are managed by sophisticated business people represented by counsel, see "Insured v. Insurers: Litigating Comprehensive General Liability Policy Coverage in the CERCLA Arena — A Losing Battle for Both Sides," Debi Davis, 43 Southwestern Law Journal 969 at page 976.
All the more so should a court not find ambiguity where none exists or fail to enforce all the terms of a contract where parties of relatively equal bargaining power are involved as insured and insurers as is often the case in environmental cleanup cases. This is especially so as regards the interpretation of clauses in the policy having to do specifically with pollution and environmental risks — the insureds conduct their activity in industry whose companies should be presumed to know and be aware of a myriad of state and federal environmental regulations as well as the impact of their activities on the environment and the effect of such impact on their business operations. CT Page 8575
(1)
The policy in this case contains a standard provision in policies of this type. The so-called bodily injury/property damage clause states:
 The company (Aetna) will pay on behalf of the insured (Linemaster) all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of bodily injury or property damages even if any of the allegations of the suit are groundless, false or fraudulent.
One of the issues raised by the motions filed in this case is whether given this policy language, the insurer Aetna had a duty to defend. But one general observation must be made before the general discussion begins. It is true that it is black letter law that: "The duty to defend has a broader aspect than the duty to indemnify and does not depend on whether the injured party will prevail against the insured,"Missionaries of the Company of Mary, Inc. v. Aetna Casualty Surety Co., 155 Conn. 104, 110 (1967), also see Shurgast v.Schuman, 156 Conn. 471, 489-490 (1968). This is the settled rule throughout the country, Technicon Electronics v. AmericanHome Assurance Co., 533 N.Y.S.2d 91, 95 (1988), cf for example Michigan law, Detroit Edison Co. v. Michigan Mutual InsuranceCo., 301 N.W.2d 832, 834 (1980) which appears similar to ours in setting out the rubrics and nostrums that trial courts should apply in reviewing insurance contracts, see Arco v. TravelersInsurance Co., 730 F. Sup. 59, 66 (W.D. Mich. 1989).
But it must be said that despite the broad aspect of a duty to defend, the duty is "constrained by the language of the insurance contract itself," id. p. 66. The duty "arises solely from the language of the insurance contract itself,"Stockdale v. Jamison, 330 N.W.2d 389, 392 (Mich., 1982). Simply put "if there is no contract to defend there is no duty to defend," Insurance Law and Practice, Appleman Vol. 7C § 4792 page 27. As was said in All-Star Insurance Corp. v. SteelBar, Inc., 324 F. Sup. 160, 163 (ND Ind., 1971). CT Page 8576
 The nature of the insurer's duty to defend is purely contractual. There is no common law duty as to which the courts are free to devise rules. The obligation on the court is merely to interpret the language of the insurance contract.
The broad language of some of the duty to defend cases must be examined in terms of the particular problem before the court. In other words, in the era and context in which a case like Missionaries of the Company of Mary, Inc. v. AetnaCasualty Surety, 155 Conn. 104 (1967) was decided there was no dispute that a "suit" had been brought under the terms of the policy. Such a "suit" would have been initiated by the traditional writ, summons and complaint. The question was given the fact a suit has been filed where does the court turn to ascertain whether there is a duty to defend. Missionaries
applied the universal rule of looking to the complaint, cf 50 ALR.2d 458, 469, Sims v. Illinois National Casualty Co.,193 N.E.2d 123, 126 (Ill. 1963).
As regulatory agencies initiated administrative actions against insureds to enforce environmental and public safety laws, insurers then raised the issue as to whether such actions were "suits" under the terms of the policy.
If ab initio it is determined that under the terms of the policy a "suit" must mean an action brought in court by means of writ, summons and complaint, then on that basis alone there could be no duty to defend based on various regulatory actions and resulting settlements and agreements.
If the term "suit" as used in the policy can be said to refer to such governmental regulatory activity then the question still remains as to how to determine if there is a duty to defend. Where a suit was filed the answer was easy look at the allegation of the complaint. Where a suit has not been filed in court but one is said to exist because of certain actions of a regulatory agency then the answer may not be so easy. Courts have looked to certain orders and/or letters informing alleged polluters of the activity thought by the agency to be proscribed.
(A)
For the duty to defend to be triggered under a liability CT Page 8577 insurance policy must a "suit" be brought by means of a writ, summons and complaint? In other words, when a policy talks about "suits" and the insurer's duty to defend them does it only refer to a definition of "suit" such as is set forth for example in Black's Law Dictionary (West, 6th ed)
 . . . any proceeding by one person or persons against another or others in a court of law in which the plaintiff pursues in such court, the remedy which the law affords him (sic) for the redress of any injury or the enforcement of a right.
If "suit" is so defined under the policy clearly none has been brought here.
First, the plaintiff Linemaster appears to argue that the court need not even address all the complexities that might be involved in having to determine the meaning of the word "suit". Here the regulatory agency's actions presented the possibility and even probability that, if some agreement had not been reached as to alleged environmental violations suit would have been brought against the plaintiff. The plaintiff cites Alderman v. Hanover Insurance Group, 169 Conn. 603, 610
(1975) in support of the proposition that where an insured enters into a settlement to avoid institution of a lawsuit there is a duty to defend. In Alderman a third party claimant was threatening suit. The defendant insurer determined the loss was not covered by the policy. Before suit was instituted, the insured settled the claim and then brought an action against the insurer to recover expenses incurred in the settlement of the claim. The important language in Alderman
appears at 109 Conn. page 610 where the court said:
 The ultimate question to be determined in this instance is whether the insured is entitled to recover expenses incurred in settlement of a claim where an insurer has wrongfully denied coverage and settlement is made before any suit has been instituted against the insured by the claimant. (emphasis added)
Here there has been no determination that there has been a violation of the duty to indemnify. Obviously where it is agreed or accepted or determined that there is a duty to indemnify and that duty has been breached by the insurer, CT Page 8578 enforcement of that contractual obligation requires the result in Alderman.
The question before the court in Alderman was how is the insured to be made whole for the breach. In effect the insurer is estopped from relying on the fact no "suit" was brought because its failure to indemnify necessarily dictates it should pay any settlement and the costs incurred by the insured to effect that settlement. These expenditures arise directly from the wrongful denial of coverage and represent an understandable attempt by the insured to avoid the aggravation, lost time and hidden expenses of having to fact court action.
The plaintiff also refers to cases like Carothers v.Capozzielo, 215 Conn. 82, 94-96 (1990) which basically hold that DEP administrative actions such as consent orders has res judicata or collateral estoppel effect, cf Munford CoveAss'n., Inc. v. Town of Groton, 786 F.2d 530, 534 (1986) where "order" considered final and not subject to challenge and even entitled to full faith and credit where order not appealed from. Clearly consent orders and unappealed orders from regulatory agencies have to be given res judicata or collateral estoppel effect if such agencies are to perform the public business in complicated areas best left to such agencies and not to the court. That has absolutely nothing to do with the reasonable interpretation of the word "suit" in an insurance policy between private parties. Similarly although in DeLaurentis v. City of New Haven, 220 Conn. 225, 248 (1991) it was held that an administrative proceeding satisfied the "prior action" requirement for vexatious suit liability, that was just a common sense recognition that a person can be improperly harassed by an administrative proceeding as well as by the filing of a frivolous or mean spirited law suit. TheDeLaurentis court merely adopted Restatement (Second) of Torts § 680 which permits liability for vexatious proceedings against another before an administrative board, id. page 248. What does that worthy result have to do with defining the term used in a contract of insurance?
References to Connecticut appellate cases dealing with questions unrelated to the one before the court are not of much help. There are no Connecticut appellate cases defining the word "suit" as it relates to the duty to defend in a CGL policy. CT Page 8579
(B)
There is a split of authority on the state and federal level as to whether the policy language giving the insurer the "right and duty to defend any suit against the insured" requires the insurer to defend when the insured receives a so-called PRP (potentially responsible party) letter. The PRP letter from a government agency notifies the insured that the state regards the insured as potentially responsible for having contaminated a site. Such letters usually "request" under threat of subsequent legal proceedings that the party provide information as to involvement in the site in question and cooperate in an investigation into the alleged contamination, Midenhausen, Insurance Coverage forEnvironmental and Toxic Tort Claims, 17 William Mitchell L.Rev. 945, 992 (1991).
One group of courts concludes that a PRP letter does not constitute a suit and thus does not commence an inquiry as to the duty to defend. Another group of courts holds that such letters do constitute "suits" for purposes of determining the duty to defend.
As Appleman notes, one court has decided to "seemingly split the difference", Insurance Law Practice, § 4527 p. 160. The Ohio Court of Appeals in Professional Rental, Inc. v.Shelby Insurance Co., 599 N.E.2d 423, 430 (1991) held that a PRP letter "by itself" cannot be considered a suit but when an administrative order is issued then the Ohio court would conclude that a "suit" has been commenced under the policy.
As noted there are many cases that have concluded the word "suit" is not limited to the commencement of judicial proceeding in a court of law but may be taken to include PRP letters to the insured and/or the issuance of administrative orders.
Several of the courts upholding this view resort to the dictionaries in what might be said to be a peculiar way. They purport to be basing their approach to contract interpretation on their obligation "to determine the plain and ordinary meaning of the word `suit' as understood by a person of average intelligence," Coakley v. Main Bonding InsuranceCo., 618 A.2d 777, 786 (NH, 1992), what would an "ordinary CT Page 8580 person" take this word to mean, Aetna Cas. Sur. Co., Inc. v.Pintlar Corp., 948 F. Sup. 1507, 515 (CA9, 1991), cf SpanglerConstruction Co. v. Industrial Crankshaft EngineeringCo., 388 S.E.2d 557, 570 (N.C., 1990). Spangler is representative of the approach taken by several of these courts. Spangler sets forth the labor of its search through the dictionaries which make clear that the primary and common definition of "suit" is a court proceeding but then relies on a secondary and an ambiguous definition from Webster's Third New World International Dictionary to support the argument that an ordinary person might rely on a not very ordinary use of the word "suit." Thus at 388 S.E.2d p. 570 the Spangler court says:
 Standard dictionary definitions of the term "suit" include court proceedings to enforce or recover on a right or claim. the [The] Random House dictionary of The English Language 1902 (2d ed. 1987) ("[t]he act, the process, or an instance of suing in a court of law"); Webster's Third New International Dictionary 2286 (1976) ("an action or process in a court for the recovery of a right or claim"); The American Heritage Dictionary of the English Language 1287 (1969) ("Any proceeding in a court to recover a right or claim"). However, not all definitions of "suit" require a court or other adjudicatory proceeding. A second entry in Webster's Third New World International Dictionary 2286 (1976) defines "suit" as "the attempt to gain an end by legal process.
cf Morrisville Water Light Dept. v. USFG, 775 F. Sup. 718,731 (D.Vt, 1991), Coakley v. Maine Bonding and Cas. Co. supra.
In a rather candid recognition of the departure from the "ordinary speech interpretation" test it set up for itself, the Spangler court then goes on to say: "we find that a `reasonable person in the position of the insured' may nothave understood the term `suit' as limiting (the insurer's) duty to defend until a court proceeding had been instigated." id. p. 570 (emphasis added). Apparently where insurance contracts are involved, an ordinary meaning test is replaced by an any possible meaning test; this may be the law in North Carolina, I take it that it is not the law here, cf.McGlinchey v. Aetna Casualty Surety Co., supra.
Coakley v. Maine Bonding and Cas. Co., 518 A.2d at p. 786 CT Page 8581 refers to the Webster definitions which it considers most relevant: "(1) the attempt to gain an end by legal process: prosecution of a right before any tribunal (2) an action or process in a court for the recovery of a right or claim." TheWakley court concedes it cannot rely on (2) to conclude that a PRP letter may be the equivalent of a "suit" but relies on what it considers the more expansive definition of (1). But if an "ordinary person" has access to a dictionary he would look up the word "tribunal" and Webster defines "tribunal" in the third edition at page 2441 as "the seat of a judge or one acting as a judge, the bench on which a judge and his (sic) associates sit for administering justice . . a court or forum of justice:" a person or body of persons having authority to hear and decide disputes so as to bind the disputants — the Supreme Court is the highest (tribunal) of the United States . . something that decides or judges: something that determines or directs a judgment or course of action — the (tribunal) of events — . . . answerable to no (tribunal) but that of their own judgment. Even Webster's definition does not seem to support the reliance of courts like Coakley for its definition of suit.
Some courts are quite candid in admitting that there is no ambiguity to the word "suit" and that in concluding that "suit" can include the sending of a PRP letter they base their decision on what they consider reasons of policy or fairness. Thus in Hazen Paper v. U.S. Fidelity Guaranty Co.,555 N.E.2d 576, 579 (1990) the court said:
 Here, the question is how we should read the word `suit', which is not defined in the policy.
 Obviously, on the record no lawsuit has been brought. Literally there is no suit. That fact alone has been sufficient to provide the answer for some courts . . . . It is, however, not sufficient to provide an answer for us.
The fact that several courts support their expansive reading of the word suit by developing a so-called functional equivalency test is further evidence that we all accept a common definition of the word "suit" to mean a court proceeding. If this were not the ordinary accepted meaning of the word how could we even discuss the notion that something else is functionally equivalent to it. The premise of saying administrative actions are functionally equivalent to a "suit" CT Page 8582 is the prior accepted notion that we have an ordinarily accepted meaning for "suit" and if "suit" does not mean court proceeding what on earth are administrative actions functionally equivalent to and why use the analogy anyway. For functional equivalency cases see Avondale Industries, Inc.v. Travelers Indemnity Co., 887 F.2d 1200, 1206 (CA2, 1989) (the administrative proceedings there bore the "hallmarks oflitigation"), Coakley v. Maine Bonding Cas. Co.,618 A.2d at p. 787, Hazen Paper v. USFG, 555 N.E.2d at p. 581, Aetna Cas. Sur. Co., Inc. v. Pintlar, 748 F.2d at p. 1517.
If the interpretation of the wording of these policies is to be placed in historical perspective, it must be remembered as earlier noted that these CGL policies were written decades ago. CERCLA was not passed until 1980 and state and federal agencies did not start initiating administrative proceedings and orders to enforce environmental laws until long after the word "suit" was embedded in those policies. The notion that as the word was first used in these policies it could have any other meaning than a court proceeding for an ordinarily intelligent insured is insupportable.
That the initiation of administrative action decades after this policy language was created could have led the ordinary person to believe such proceedings could be "suits" is equally unpersuasive for another reason. Certainly from reading scores of these cases and various legal articles it is apparent that the insurance industry from the time that environmental laws were being enforced was claiming such agency proceedings as PRP letters were not "suits" as defined in CGL policies. Again we are dealing with commercial insureds not unsophisticated working people who after a hard day's work are faced with a sophisticated hard selling insurance agent trying to sell an insurance policy loaded with fine print. Indeed for a commercial insured to reasonably believe that "suit" meant something more than it meant when the language of these policies was first formulated it would have to not only to have lost its dictionary but also to have retained a lawyer who never interested him or herself in the developing law in this area.
Courts giving an expansive definition to the word "suit" sometimes also rely on an argument which although it has a superficial attraction is basically circular. A typical statement of the position is set out in Morrisville Water CT Page 8583Light Dept. v. USFG, 775 F. Sup. 718, 733 (DVT, 1991). The court discusses cases giving an expansive interpretation to "suit" but notes cases like Detrex Chemical Indus. Inc. v.Employers Ins. of Wausau, 746 F. Sup. 1310 (ND Ohio, 1990) that limit the definition to proceedings brought in court. The Morrisville court then says:
 We decline to adopt this approach for two reasons. First, the fact that another reasonable interpretation of the term "suit" exists simply creates an ambiguity. Under Vermont law any ambiguity must be strictly interpreted in favor of (the insured), not (the insurer).
This is quite a remarkable statement. I suppose it could mean that in any contested case as long as an insured can find even one court opinion which gives an interpretation to a word or clause in any insurance policy favorable to it and contrary to the interpretation given by the insurer, the insurer will always lose. Or perhaps in fairness, if a sufficient percentage of such opinions are found or maybe a majority then the insured will prevail — then a trial court in deciding these issues will take a count and argue with counsel over the significance of various percentages. Clearly this abdication of judicial responsibility is not acceptable. Ab initio a court must decide what the "reasonable interpretation" of policy language is to its own satisfaction; having so decided it necessarily has decided an interpretation different from its own is not a reasonable interpretation. Whether one other judge, or even majority of judges disagree should certainly be taken into account in arriving at the interpretation given but only insofar as the reasoning is persuasive or not persuasive. Beyond that the fact of the existence of a split of authority should be of no significance.
Another argument referred to by some courts giving an expansive interpretation to "suits" and rejecting the position that the word connotes actions brought in court is set forth in USFG v. Specialty Coatings Co., et al, 535 N.E.2d 1071, 1079
(Ill, 1989). Referring to the sending of PRP letters the court says:
 The fortuitous choice to first seek voluntarily compliance instead of court action does not eliminate the specter of potential liability for cleanup costs CT Page 8584 and damages to be incurred by defendants. Indeed it is the very threat of available formal legal action that is expected to motivate the recipient of a PRP letter into responding acceptably to the government's suggestions. From the foregoing we conclude that the circuit court properly determined that USFG is obligated to defend actions contemplated by the PRP letter.
This position matches the circularity of reasoning in the just discussed split of authority equals ambiguity argument but suffers the added liability of being completely conclusory. If it is decided that the reasonable interpretation of "suit" means an action brought in court then that is what the parties agreed to and the fact that PRP letters were sent out does not create a duty to defend. If it is decided that the sending of PRP letters does constitute a "suit", then the fortuity of whether the regulatory agency sought voluntary compliance as opposed to going to court first is irrelevant. That is, the fact that the agency has enforcement options in itself says nothing about how the agreement between the insured and the insurer should be interpreted regarding the duty to defend.
Other courts, which perhaps are more candid in their approach, give a more expansive meaning to the word "suit" than its traditional or ordinary meaning of a court proceeding based largely on what is purported to be reasons of sound environmental and/or legal policy.[3] Query whether this is appropriate when no court has held to my knowledge that it would be violative of public policy to permit "suit" in CGL policies to be defined as matters brought to court. If that is so, a public policy argument per se cannot be used to find ambiguity in the meaning of a word used in an insurance contract, unless judges are to be given blanket authority to rewrite insurance policies.
The cases that best set forth the view that reasons of policy require that "suit" be read to include PRP letters and/or administrative orders from a regulatory agency are:Aetna Casualty Surety Co., Inc. v. Pintlar Corp., 948 F.2d 1507,1516 (CA9, 1991), Ryan v. Royal Insurance Co. ofAmerica, 916 F.2d 731, 735 (CA1, 1990), Hazen Paper v. USFG,555 N.E.2d 576, 579 (Mass. 1990). These cases will now be discussed in more detail. CT Page 8585
Hazen begins its substantive discussion at 555 N.E.2d page 581. The court's reasoning is based on concern for the insured's position. Faced with a PRP letter the company had a strong interest in early involvement in settlement discussions with the agency. This was "crucial" to protect the company's interest. The amount of recovery could be increased if there is a failure to settle prior to actual litigation; there can be a fine for failure to participate in the agency process of planning the cleanup. The prospects of avoiding financial responsibility is minimal since liability for the company is not based on fault; the risks placed on the company were great since its liability is joint and several. Thus the Hazen Paper Company's opportunity to protect its interests could well have been lost before any lawsuit was brought.
But all of this "reasoning" really boils down to an observation that it sure would be great for the insured if the insurer had a duty to defend when a PRP letter is sent. The real task, however, would seem to be trying to decide what the parties to the insurance contract bargained for. In fact, the court was quite candid in not seeing contract interpretation as its task when in "we know what is best for you reasoning" it said: "the early involvement of an insurer in such a process (settlement process with agency after PRP letter) is obviously important to the insured (and very possibly to the insurer), assuming, of course, that the claim is one that falls within the coverage of the policy," id. p. 582. On the preceding page it must be said the court did say: "The consequences of the receipt of the EPA letter were so substantially equivalent to the commencement of a lawsuit that a duty to defend arose immediately." But the bargain struck by these parties was that the insurance company would have a duty to defend a "suit" not the substantial equivalent thereof and unless there is some linguistic or analytical basis to distinguish between the word "lawsuit" and the word "suit" I just cannot understand the basis of the court's ruling.
In Pintlar Corporation the court makes many of the same observations as the Hazen Paper court, but then goes on to justify imposing the costs of settlement activity on the insurer by saying at 948 F.2d at p. 1517:
 A fundamental goal of CERCLA is to encourage and facilitate voluntary settlements . . . It is in CT Page 8586 the nation's best interests to have hazardous waste cleaned up effectively and efficiently. But the insured is not required to submit to, and may in fact wish to oppose the threat. In either event, the insurer's duty to defend may well be triggered.
The court never answers what to me is a telling observation by the insurer, however, what "rule of construction obligates a court to interpret a policy so that settlement of litigation may be fostered," id. at page 1517.
Even if that were not the critical consideration, which it is, there are public policy arguments that argue against the court's result which seems to look at the problem from the point of view only of the particular insured. Decisions likePintlar result in imposing massive costs on the insurance industry not contemplated by their premiums. Should it not be a public policy goal to avoid such a result when it is obvious that the net effect will be to bankrupt some insurers, drive others out of supplying vital insurance coverage to whole classes of industry, or result in premium increases imposed on all businesses, some of whom have not contributed to pollution or may have taken steps to clean up pollution caused by others without government prompting? Shortly the court will discuss the advantages to a "bright line" test by having "suit" mean only court actions. As will be discussed in more detail, courts like Pintlar that abandon such a "bright line" test have to examine the actual letters and orders sent to the insured companies to see if the relationship between the agency and the company was "adversarial" enough to allow the court to consider the PRP letters as a "suit." Is not there an overwhelming need in this area for bright line tests fairly arrived at to try to limit the explosion of litigation caused by the effect of environmental legislation on coverage under CGL policies? In this case alone over (300) three hundred pages of briefs were filed and both sides have cited scores of opinions from every conceivable jurisdiction on the definition of "suit" issue as well as on other definitional disputes. Would not it be better for this enormous cost of litigation to be avoided so that the monies could be used to help clean up the environment and/or reduce the costs of actually running businesses as opposed to filing and defending lawsuits?
Ryan v. Royal Insurance Co. of America, supra first CT Page 8587 discusses what meaning can or should be given to the word "suit" 916 F.2d at pp. 735-736 and its analysis is similar to the purely linguistic analysis engaged in by other courts and previously discussed. It seems to hold the word "suit" is ambiguous but then goes into a lengthy analysis of the public policy considerations involved in interpreting the duty to defend. It should be noted that courts like Ryan that reject the court proceeding definition of "suit" still have to engage in a public policy analysis because even these courts, as will be discussed, do not consider every letter from a regulatory agency about possible pollution problems as initiating a "suit" and thus a duty to defend. The heart of the public policy discussion section of the opinion is at 916 F.2d at page 740. The court discusses the possibility that its expansive view of "suit" creates the danger of fraud being practiced by insurers. Then the court goes on to say:
 Admittedly, requiring a suit and an ensuing judgment as conditions precedent to insurance reimbursement will serve to implement the principle of indemnity and limit discernible opportunities for wagering and fraud. It can plausibly be argued, however, that so rigid a rule jettisons the baby with the bath water. Insurance is meant, by and large, to afford coverage, not to exclude it — and a suit-cum-judgment formulation by no means represents the broadest scope of coverage a liability insurer may provide without endangering the principle of indemnity. Even short of judicial proceedings, let alone entry of judgment, the fundamental purposes underlying the principle of indemnity will not be placed in mortal jeopardy so long as the factual expectancy of ultimate liability is sufficiently high and its quantification sufficiently precise.
 The junction where environmental law meets insurance law provides especially fertile ground for these equivalencies. Where pollution coverage is concerned, there is precious little to commend an inflexible suit-cum-judgment rule as opposed to a standard anchored in the probability that a potential liability will actually materialize in the immediate future.
Even considering this particular public policy argument, and I still do no accept that approach as appropriate for CT Page 8588 contract interpretation where there is no claim contrary interpretations violate public policy in such a way that they cannot be permitted — even with that I cannot accept the view of the Ryan court. The problem is not the probability of liability as such but the unpredictable extent of liability — that is what really creates the problem for insureds as a class and the insurance industry. Given that, all the public policy considerations previously referred to which argue against the desirability of the expansive view of "suit" come into play. More to the point how can an insurer under these circumstances determine risks and rationally spread them; this is a factor which the Ryan court in its exegesis on the purposes of liability insurance does not even address. The "public policy" grounds for giving an expansive reading to the word suit are no more persuasive to this court than the linguistic analysis.
(C)
It is apparent from the previous discussion that the court believes that the ordinary meaning should be given to the word "suit" in these CGL policies — a "suit" is an action filed in court to secure damages or injunctive relief. After the policy language here talks about the insurer's "right and duty to defend any suit against the insured (Linemaster)" it says there is such a duty even if the "allegations of the suit are groundless, false or fraudulent." The use of the word "allegations" implies that the traditional meaning of the word "suit" is intended. Also, in the policy language there is an explicit differentiation between "claim" and "suit". Especially where there is a claim of ambiguity a court must attempt to give meaning to every word of a contract, Downs v.National Casualty Co., 146 Conn. 490, 495 (1959). There is a clear differentiation between "claim" and "suit" and the duty to defend only arises if "suit" is brought. Detrex ChemicalIndustries v. Employers' Insurance of Wausau, 681 F. Sup. 438,443 (ND Ohio, 1987), cf Couch on Insurance § 51.43 (2d reved). If a PRP letter or even an administrative order are the "functional equivalents" of "suits" what else is there left in the universe that can be considered a "claim". Also seePatrons Oxford Mutual Ins. Co. v. Maroy, 573 A.2d 16, 20 (Me. 1990), also see Arco v. Travelers Ins. Co., 730 F. Sup. 59, 68
(WD Mich. 1989), Technicon Electronics v. American HomeAssurance Co., 533 N.Y.S.2d 91, 104 (1988), Ray Industries, Inc.v. Liberty Mutual Ins. Co., 974 F.2d 754, 761 (CA6 1992). CT Page 8589
As mentioned in the discussion of the Pintlar case, one of the important reasons why this court accepts the judicial proceeding definition of "suit" is the analytical confusion that results when a "functional equivalent" test is sued. TheRyan court at 916 F.2d at p. 740 was quite candid in saying: "Admittedly, requiring a suit and judgment as conditions precedent to insurance reimbursement will serve to implement the principle of indemnity and limit discernible opportunities for wagering and fraud." Courts like Ryan in recognition of these concerns and their obligation to give a semblance of meaning to contract language then go on to say it is not every PRP letter that can be considered a "suit". There must be "something more" than an invitation by the agency voluntarily to initiate cleanup. The Ryan court expects a trial court to examine the exchanges between regulatory agency and the insured company — is there an "adversarial posture", is there a note of "coerciveness", is there a "seriousness of purpose which characterizes the government's role," id at page 741, cfAvondale Industries, Inc. v. Travelers Indemnity Co., 887 F.2d 1200,1206 (CA2, 1989), see also Hazen Paper v. USFG at555 N.E.2d at pp. 579-80. One court, trying to avoid these interpretive dilemmas has held that a PRP letter is not the "functional equivalent" of a suit but the issuance of an administrative order certainly is, Professional Rental v.Shelby Insurance, 599 N.E.2d 423, 429-30 (Ohio, 1991). As one commentator notes: "An administrative order is issued if no response is received to the PRP letter and unlike the letter, it carries sanctions for failure to abide by its terms." Appleman, Insurance Law Practice, Vol. 7A, § 4527 (1994 Pocket Part, p. 160).
The distinction between a PRP letter and an administrative order that Professional Rental seeks to make is more illusory than real. For all intents and purposes a company knows if it does not comply with the demands set forth in a PRP letter an administrative order will issue.
It is apparent to me at least that any attempt to apply a functional equivalent to a suit analysis to the definition of "suit" in CGL policies leads to a quagmire of conflicting interpretations whether one holds that particularly nasty PRP letters might meet the test or requires administrative orders that the agency is apparently serious about. CT Page 8590
The need for precise rules of judicial interpretation and the problem of not having them is further underlined if we examine the problem from another perspective. As was noted early on in this opinion, the duty to defend in these policies has universally been recognized as broader than the duty to indemnify. That is certainly fair but what makes it capable of rational application is that pursuant to cases likeMissionaries where suit has been brought in court the scope of the duty to defend is ascertained by examining the complaint. If "suit" is not so defined, I believe real practical problems are raised for courts that give an expansive reading to "suit" and hold that PRP letters and/or administrative orders can constitute a "suit". How does a court practically apply the functional equivalence to a suit test in this context? Where does a court go to ascertain if there is a duty to defend — does a court look to all the PRP letters sent and their contents, only letters that have a more threatening tone, do the contents of all administrative orders qualify even if some were issued years in the past and were not acted on, does it matter if consent orders were entered into and there is no real dispute between the insured and EPA — is that a "claim" rather than a "suit"? Besides how does one determine if there is in fact a real or substantial dispute? Does the duty to defend abate if initial PRP letters made demands and threatened unilateral action but then later negotiations indicated there was no real dispute over EPA allegations and the company voluntarily complied with EPA demands? Would the relationship be still "adversarial if the company agreed to the EPA demands but only wished to negotiate more time to comply with them?
I believe there is no acceptable basis to conclude "suit" must be given the meaning Linemaster advances. It seems to me contrary to the ordinary meaning of the word, is not based on sound reasons of public policy, and leads courts who accept an expansive meaning of the word to insoluble difficulties in terms of providing practical rules to guide parties in this industry.
(2)
EPA and DEP actions have required and will require Linemaster to spend large sums of money for so-called environmental cleanup and response costs as a result of alleged pollution of the land. CT Page 8591
The question becomes are these "cleanup" costs "damages" under the terms of the policy. Under the terms of the policy in this case there is coverage for "all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage." This is standard language in these CGL policies.
One commentator notes another curious pattern of judicial activity as regards interpretation of contract language involving insurance policies. Not only are rules of interpretation developed to protect isolated individuals and families when dealing with large insurance companies sometimes inappropriately transferred to the forum of industrial and commercial insurance, it is also true that judicial rules of interpretation actually adopted for use in the latter forum are changed over time.
In Insurance Law Practice at Sec. 4521, page 132 Appleman notes that:
 Before the advent of coverage claims for CERCLA response costs, "damages" covered by liability insurance were generally recognized as being limited to compensatory damages and did not include equitable remedies of restitution and recovery for costs of compliance with injunctions.
Appleman goes on to define CERCLA cleanup and response costs as the costs of cleanup or removal of released hazardous substances, costs of remedial action necessary to prevent or minimize release and migration of such substances and the costs of related enforcement activities. Types of actions that can be categorized as responses for which costs are available are monitoring investigation, on-site treatment or incineration, recycling, collection of substances as runoff, fencing and other ways of limiting access, alternate water supplies, etc., id page 132.
An early case predating CERCLA in defining damages adopted the definition in Black
 A pecuniary compensation or indemnity which may be recovered in the courts by any person who has suffered loss, detriment or injury whether to his person, CT Page 8592 property, or rights, through the unlawful act or omission or negligence of another. This is a far cry from the cost to unsuccessful litigants of complying with an injunctive decree.
 Aetna Casualty Surety Co. v. Hanna, 224 F.2d 449, 503
(CA5, 1955).
Also see Desrochers v. New York Casualty Co., 106 A.2d 196, 198
(NH, 1954).
The CGL policy language goes back many years and predates CERCLA which was enacted in 1980. In 1983 the Michigan Court of Appeals decided the first case to hold that the term "damages" in CGL policies included costs incurred in state ordered environmental cleanups, United States Avieux v.Travelers Ins. Co., 336 N.W.2d 838, 842 (Mich, 1983). InAvondale Industries v. Travelers Indemnity Co., 887 F.2d 1200,1205 (CA2, 1989) the Second Circuit in 1989 became the first Federal Circuit to hold cleanup costs are "damages" giving rise to an insurers duty to defend under CGL policies. See generally Insured v. Insurers: Litigating comprehensiveGeneral Liability Policy Coverage in the CERCLA Arena — ALosing Battle For Both Sides. Davis 43 Southwestern Law Journal 969 (1990).
The commentators note there is a sharp division in the courts as to whether clean-up and response costs constitute "damages" with the majority of courts concluding such costs constitute damages. As Davis point out there is veritable turmoil in the courts over this and other issues spawned by the interaction of CERCLA with standard CGL policies with forum shopping and huge amounts of money wasted on litigation.
What then do the cases say on both sides of this issue? For the proposition that so-called cleanup costs are "damages" under CGL policies, the leading cases are: IndependentPetrochemical Corp., et al v. Aetna Casualty Surety Co.,944 F.2d 940 (DC Cir. 1990), Avondale Industries, Inc. v. TravelersIndemnity Co., 887 F.2d 1200 (CA2, 1989), Chesapeake UtilitiesCorp. v. American Home Assurance Co., 704 F. Sup. 551 (D.Del. 1989), Intel Corporation v. Hartford Accident Indemnity Co.,592 F. Sup. 1171 (ND Cal., 1988), USFG v. Thomas Solvent Co.,683 F. Sup. 1139 (WD Mich, 1988), New Castle County v.Hartford Accident Indemnity Co., 673 F. Sup. 1359 (D.Del, CT Page 8593 1987), Coakley, et al v. Maine Bonding Casualty Co.,618 A.2d 777 (NH, 1993), AIU Insurance Co., et al v. SuperiorCourt, 799 P.2d 1253 (Cal. 1990), Hazen Paper Co. v. USFG Co.,555 N.E.2d 576 (Mass. 1990, Minnesota Mining Mfg. Co. v.Travelers Indemnity Company, 457 N.W.2d 175 (Minn. 1990), CDSpangler Construction Company v. Industrial Crankshaft Engineering Co., 388 N.E.2d 557 (N.C., 1990), U.S. Aviex Co. v.Travelers Insurance Co., 336 N.W.2d 838 (Mich. 1983). Law Review articles supporting this position are Insureds VersusInsurers: Litigating CGL Policy Coverage in the CERCLA Arena —A Losing Battle for Both Sides, Debi Davis 43 Southwestern Law Journal 969; The Applicability of CGL Insurance for CERCLAResponse Costs, Donald Hallowes, 18 Capital University Law Review 413. Generally see Insurance Law Practice, Appleman § 4521, Insurance-Pollution Cleanup, 87 A.L.R.4th 444. Fittingly the Davis article entitled her review of the cases on this issue: "Current Legal Status: Turmoil in the Courts."
Leading cases holding cleanup costs are not "damages" as the term is used in these CGL policies are: CincinnatiInsurance Co v. Milliken, 857 F.2d 979 (CA4, 1988),Continental Insurance Co. v. Northeastern Pharmaceutical Chem. Co., 842 F.2d 977 (CA 8, 1988), Maryland Casualty Co. v.Armco, 822 F.2d 1348 (CA4, 1987), Mraz v. Canadian UniversalIns. Co., 804 F.2d 1325 (CA4, 1986), USFG v. Morrison GrainCo., 734 F. Sup. 437 (DC Kan, 1990), Patrons Oxford MutualIns. Co. v. Marios, 573 A.2d 16 (Me, 1990). A law review article supporting this view is "Environmental Liability and Limits of Insurance", Kenneth Abraham, 88 Columbia Law Review 942. Earlier cases whose reasoning supports this position areAetna Casualty Surety Co. v. Hanna, 224 F.2d 499 (CA5, 1955), Desrochers v. Casualty Co., 106 A.2d 196 (1954). There are also strong dissents in cases cited above as supporting the view that cleanup costs are "damages", see Coakley v.Maine bonding Casualty Co., supra at 618 A.2d page 788,Minnesota Mining Mfg. v. Travelers Indemnity Co., supra at 457 N.W.2d at page 184.
It would be well at this point to focus on the actual policy language before the cases are discussed.
 The company (Aetna) will pay on behalf of the insured (Linemaster) all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage . . . CT Page 8594
As has been noted, this very language has been used in CGL policies since at least 1950, see Desrochers v. New YorkCasualty Co., 106 A.2d at page 198, long before CERCLA, passed in 1980, was a gleam in the eye of the United States Senate. It had a well defined and understood meaning and the cases held without any apparent dissent that this policy language especially as it uses the words "as damages" made a clear distinction between legal damages and injunctive relief,Desrochers v. New York Casualty Co., supra, Aetna Casualty Surety Co. v. Hanna, supra, see numerous cases cited in both these opinions. The cost to a party of complying with a mandatory injunction (or complying with the order of a regulatory agency) cannot be regarded as a sum payable "as damages." As Desrochers notes "Damages are recompense for injuries sustained . . . They are remedial rather than preventive and in the usual sense are pecuniary in nature . . . The expense of restoring the plaintiff's property to its former state will not remedy the injury previously done nor will it be paid to the injured parties" (as damages), 106 A.2d at page 198.
As distinguished from claims for injunctive relief, restitutionary relief, cleanup costs and response costs, damages includes "only payments to third persons when those persons have a legal claim for damages," Aetna Casualty Surety Co. v. Hanna, 224 F.2d at page 503.
Interestingly the majority of cases holding that cleanup costs are damages do not even refer to the prior law represented by cases like Desrochers and Hanna which interpreted the language in the CGL policy now before the court. They write their opinions in the late '80s or early '90s not as if this policy language was thirty-five plus years old but as if it somehow came out of the heavens to be interpreted just at the point when insureds were arguing that their CERCLA cleanup costs should be shifted to their insurers. Insofar as these cases mention Desrochers or Hanna,
they do recognize that these cases present a problem for their position, see Coakley v. Maine Bonding Casualty Co., 618 A.2d at page 782 et seq, see dissent also, Spangler Construction v.Industrial Crankshaft, supra at 388 S.E.2d page 568, also seeHazen Paper v. USFG, supra at 555 N.E.2d 511 page 583.
Many of the cases holding cleanup costs are "damages" CT Page 8595 conclude that the word "damages" is ambiguous in meaning. Thus, the word "damages" should be interpreted as the ordinary lay person would and in fact since the insurance companies wrote the policies ambiguities should be resolved against the companies on this issue, see Hazen Paper v. USFG supra at page 583, Minnesota Mining Mfg. v. Travelers Indemnity supra at page 180, Chesapeake Utilities Corp. v. American HomeAssurance supra page 559.
Two of the cases, however, make statements that at least to this court are truly remarkable. In Spangler Construction
at 388 S.E.2d page 568 referring to "damages" the court says
 Clearly, there is a specific, technical definition for the word: "payments to third persons when those persons have a legal claim for damages", Hanna 22f F.2d at 503. If the insurer intended that "damages" have only this meaning, it should have so indicated in the policy.
In Hazen Paper at page 583 the court said:
 We explicitly reject the reasoning of some courts that incorporates `previous judicial interpretations' into the insurance contract to narrow the scope of the word `damages' and thus purport to eliminate any ambiguity.
This type of reasoning, at least to me, ignores basic rules of contract interpretation by importing assumptions as to the characterization of the parties who negotiate these CGL policies which do not comport with commercial reality. It is my understanding that: "Under our law the terms of an insurance policy are to be construed according to the general rules of contract construction," Griswold v. Union Labor LifeIns. Co., 186 Conn. 507, 512 (1982). In this context "the determinative question is the intent of the parties, that is, what coverage the . . . (insured) expected to receive and what the (insurer) was to provide, as disclosed by the provisions of the policy," Marcolini v. Allstate Insurance Co.,160 Conn. 280, 283 (1961).
How do we determine what the reasonable expectations of the parties are? One would think that we look to see who the parties are and what resources they bring to the bargaining CT Page 8596 table. That is, nothing in Griswold or Heyman Associates No.1 v. Insurance Co. of Pennsylvania, 231 Conn. 756 (1995) leads me to assume that once it is ascertained one of the parties is an insurance company we are to abandon ordinary rules of contract construction. The CGL policies are negotiated between insurance companies and commercial and industrial concerns who have been governed by environment regulations on the state and local level for at least a decade and a half. We are not dealing with insurance companies who have negotiated technical contracts of insurance with unsophisticated lay persons and families. We are dealing with contract formation between commercial entities. Since what makes sense in one area of commercial law makes sense in other areas the commentary to § 42a-1-205 of the Connecticut Uniform Commercial Code is of interest. There it says, referring to the code "this act rejects both the `lay-dictionary' and the conveyancer's reading of a commercial agreement. Instead the meaning of the agreement of the parties is to be determined by the language used by them and by their action, read and interpreted in the light of commercial practices and other surrounding circumstances . . . This act deals with `usage of trade' as a factor in reaching the commercial meaning of the agreement which the parties have made. The language used is to be interpreted as meaning what it may fairly be expected to mean to parties involved in a particular commercial transaction in a given locality or in a given vocation or trade."
It is not supportable, to me at least, that in interpreting language of CGL policies negotiated between businesses in arms length transactions that either parties' reasonable expectations as regards the meaning of their contract and its language should not be held to be governed by previous judicial interpretations of that language.
As the court said in Patrons Oxforce Mutual Insurance Co.v. Marios, 573 A.2d 16, 19 (Me, 1990):
 Prior to the past several years, there had been no suggestion that this insurance contract language providing coverage for sums, paid "as damages" would cover anything other than amounts that might be awarded against an insured to recompense a third party for damage to its property. Instead the case law was to the contrary . . . Recently, however, some courts CT Page 8597 have argued that lay persons reading an insurance contract do not understand the traditional meaning of sums paid "as damages." Applying rules of construction that favor insureds over insurers, these courts have found coverage for cleanup costs undertaken by the insured in response to governmental demands. We do not adopt such reasoning. There are many words, phrases or paragraphs in a standard insurance contract that a first time reader does not understand. That circumstance does not justify excising such provisions from the contract. Only when they are ambiguous is their interpretation affected, and the insured given the benefit of the doubt . . . Previous judicial interpretations made clear the meaning of the words "Pay as damages" when used in an insurance contract . . . Ambiguity (as opposed to outright lack of understanding) is created only by converting an insured's hope or assumption that every out-of-pocket payment is covered into a part of the contract language.
I take it then that this Maine case is only referring to what is settled law: . . . "if the terms of the policy have a clear meaning by judicial decision, it can scarcely be said that they are ambiguous, so as to bring into effect the rule of strict construction," Insurance Law Practice, Appleman § 704, p. 339, see Stein-McMurray Ins., Inc. v. Highlands Ins.Co., 520 P.2d 865 (Id, 1974), Davis v. Combined Ins. Co. ofAmerica, 70 S.E.2d 814 (W.Va., 1952).
The dissent of Justice Kelley in Minnesota Mining Manufacturing v. Travelers Indemnity, 457 N.W.2d at p. 185
summarizes the previous observations and in my opinion represents persuasive reasoning.
 By holding that the comprehensive general insurance policies here involved provide coverage to reimburse corporate polluters for response cleanup costs, some of which they more or less voluntarily assumed by agreement with the state without consent of the concerned insurers upon whom they now call for reimbursement, the majority opinion, it seems to me disregards long established insurance policy language construction rules. These rules prohibit courts from reading ambiguity into the plain language of a policy simply in order to provide coverage . . . . In so doing, the majority finds CT Page 8598 ambiguity not with reference to how the term "damages" is employed in the context of the policy language but rather in reliance on abstract definitions of the term `damages' found in standard dictionaries. A valid argument could be advanced that such reference might be relevant to this construction had the insureds in these cases been lay persons, unsophisticated in the acquisition of liability insurance coverage and had been afforded liability coverage more or less on a "take it or leave it basis" under circumstances resulting in what might be considered to be a contract of adhesion . . . it is much more probable that the policies in question were negotiated between large corporations, each of which had access to sophisticated insurance and legal departments or advice.
But even if all of the above analysis is put aside and we posit a confused layperson facing the insurance company giant as the starting point for the inquiry, a resort to the dictionary to find ambiguity in the word "damages" is not as persuasive as the cases espousing this view seem to suggest. Again the problem of interpretation must be kept in mind — cases concluding cleanup costs are damages argue that a narrow definition of damages cannot be given. The ordinary layperson would not interpret the word to mean just "legal" damages, there is to that person no distinction between legal or equitable damages but the layperson would consider all cost and expenses he or she must bear, all the restitution that must be made as damages.
These cases then often resort to the dictionary to underline their point. But these cases often rely on Webster's Third International Dictionary, Coakley at 618 A.2d page 785, Chesapeake Utilities Corp. 704 F. Supp. at page 559,New Castle County 674 F. Supp. at page 1365 Minnesota Mining Manufacturing 457 N.W.2d at page 182.
The dissent in Boeing Co. v. Aetna Casualty Surety Co.,784 P.2d 507, 520-521 (Wash. 1990) does an interesting analysis of some 19 dictionaries. Chief Justice Callow concludes that the standard dictionary definition of damages is that it represents reparation for detriment or injury sustained. But as the judge points out CERCLA response costs are not reparation for detriment or injury sustained so they do not fall within the ordinary dictionary definition. In Boeing the CT Page 8599 insured argued that the definition should not be so narrowly construed and pointed to Random House Dictionary to show that damages can also mean "costs or expense." But in Random House this definition is noted to be "informal." As Justice Callow goes on to note only Webster's Third New International Dictionary and the related Webster's New Collegiate Dictionary do not identify the "cost or expense" definition of damages as informal, colloquial, or slang but these dictionaries do not specially identify such usages, id at footnote 6 page 521.
Justice Callow engaged in this discussion in order to give effect to the actual language of the policy. That language says that the insurer is responsible to pay the insured for "all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage" (emphasis added).
The case of United States Aviex Co. v. TravelersInsurance Co., supra is regarded as a leading case in this area. If we continue with a linguistic analysis we note that that court at 336 N.W.2d at page 843 defines as too "narrow" a view of damages that would preclude the recovery of cleanup costs by the insured. It's view, however, in effect amends the policy language by failing to give any significance to the words "as damages" and in effect interpreting the policy language to read that the insurer agreed to pay "all sums
which the insured shall become legally obligated to pay" cfContinental Ins. v. Northeastern Pharmaceutical supra at 842 F.2d page 986. As said in Hanna so long ago "the policy covers only payments to third persons when those persons have a legal claim for damages against the insured on account of injury to or destruction of property," 224 F.2d at page 503.
Courts that interpret this policy language as meaning that cleanup costs are included in "damages" it must be said are quite creative in their reasoning. They establish the requisite property nexus to the policy language by talking of the state's possessory interest in the groundwater, referred to in one case as the public fisc, see Spangler construction [Construction]v. Industrial Crankshaft 388 S.E.2d at page 564, United StatesAviex 336 N.W.2d at page 843, USFG v. Thomas Solvent Co.,
683 F. Supp. at page 1169. Under that analysis cleanup costs could conceivably be considered damages "because of . . . property damage" but as professor Abraham notes they cannot be regarded as compensation for property damage. CT Page 8600
That, to me, is a serious flaw in the reasoning of cases that in effect give no significance to the words "as damages" in this policy language. A case like Spangler Construction
for example satisfies itself that there has been damage to property, then at page 565 goes on to hold cleanup costs can be said to be damages because of property damage. But it fails to explain how cleanup costs can be said to be for
property damage. Cleanup costs may bear no relationship to and often dramatically exceed any damage that may be inflicted on the government property interest or neighboring property. Again, as Professor Abraham notes at page 969 of his article in 88 Columbia Law Review:
 "The argument that because the cost of cleanup is incurred in connection with a particular piece of property it constitutes damages because of . . . property damage misses the point. The lion's share of cleanup costs are likely to be incurred not "because of" property damage, but because of the threat to the health of persons residing off the property to be cleaned up.
Cleanup or response costs do not represent compensation for property damage but rather represent the expense of preventing or mitigating an injury, USFG v. Morrison GrainCo., 734 F. Supp. at page 449. See for example DEP Order No. WC4791 in this case which succently sets forth what is really involved here and the basis of the agency's actions and claims against Linemaster, also see affidavit of Gary Konnett.
Such costs really represent economic loss or the cost of compliance by a company with governmental environment regulations and statutes, Mraz v. Canadian Universal Ins. Co.
804 F.2d at page 1329. It would be unfair to characterize such costs as "damages" and shift their payment to insurers. CERCLA liability has been described as fundamentally uninsurable, the insurers cannot calculate and charge premiums that bear any relation to the actual risks of CERCLA liability. Under these circumstances how can it be said that the parties reasonably could have expected that cleanup costs would be considered "damages" under the policy. Such an analysis would merely condone giving insureds a windfall for coverage they never paid for and which neither party contemplated as a risk. CT Page 8601
The fact that such costs really represent economic loss rather than damages under the policy is only underlined by the logical absurdity argument which cases reaching a different conclusion say results from not adopting their position. They point out that it is "merely fortuitous" from the point of view of the insured or insurer that the state has chosen to have the insured remedy the contamination rather than choosing to incur the cleanup costs itself and then suing in court. If there is coverage in one situation there should be recovery in both. See Spangler Construction 388 S.E.2d at pp. 567-568,U.S. Aviex v. Travelers 336 N.W.2d at page 843, cf. AIU Ins. Co. v.FMC Corp., 799 P.2d at pp 1275-1277.
But as Chief Justice Brock points out in his dissent inCoakley at 618 A.2d page 791 it is no doubt true that the insured in these situations have a duty to comply with environmental law. If Linemaster acted on its own to clean up hazardous waste prior to any order by the government then the costs of its response would not be damages. The money that was spent could not be a compensation for any injury nor would it be paid to any injured party. The resources spent would simply represent costs incurred by Linemaster in the course of conducting its business. If Linemaster acts in response to state intervention how has any party been quantifiably injured and how can it be said that the response costs now are some form of compensation for an injury. They are still a cost of doing business. They would still be such if the state itself intervened and spent money to remedy the problem and then sued for reimbursement of the response costs. The state would not be suing for any quantifiable damage to government property or neighboring property. The money that would be owing the state by Linemaster would not really represent the value of any damages but would represent the value of the unjust benefit conferred on Linemaster by the state when the state assumed what were really Linemaster's responsibilities.
I do not believe under CGL policies so-called cleanup costs can be said to be "damages" concerning which the insurer is obligated to reimburse the insured.[4]
(3)
To be covered by a CGL policy the damages such as the one now before the court, the property damage must be "caused by CT Page 8602 an occurrence." The policy as is true in policies of this type define an occurrence as:
 an accident, including continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.
The law on the issue of how this clause should be interpreted is according to Appleman "unsettled" and the courts have taken diverging and conflicting views on how the "expected or intended" language should be interpreted. When is damage expected or intended? Does a subjective or objective test apply? How much knowledge must an insured have before damages resulting from the insured's activities will be considered "expected or intended"? See Insurance Law Practice, Appleman § 4523 pp. 144-47, also see generally "The Applicability of CGL Liability Insurance for CERCLA Response Costs" 18 Capital University Law Review 413, 415-19.
One commentator has noted that the issue of denial of coverage based on whether damages was "expected or intended:
 often is extensively fact-orientated and substantially increases the scope and expense of coverage litigation. The carrier's allegations may implicate scores of witnesses and countless documents pertaining to the policyholder's operations and knowledge over several decades," Mielenhausen, "Insurance coverage for Environmental 
Toxic Tort Claims" 17 William Mitchell L.Rev. 945, 987 (1991).
The court in International Minerals Chemical Corp. v.Liberty Mutual Insurance Co., 522 N.E.2d 758, 765 (Ill, 1988) noted the diversity of results reached by the courts in applying the policy language to specific factual situations but cites a host of case law and commentary for the proposition that:
 . . . it has been generally agreed . . . that when considering the three components of the "occurrence" definition — the act, the event, the injury or damage and the insured's mental state — to determine whether the general insuring provision has been triggered, the relevant inquiry is not whether the insured intended or CT Page 8603 expected the event resulting in the damage but whether he (sic) intended or expected the damage resulting from the event.
Also the majority of courts seem to accept the view that in deciding whether the insured intended or expected the damage the test to be applied should be a subjective one, see Appleman at § 4523, page 144 and Brown Foundation v. St. PaulInsurance Co., 814 S.W.2d 273, 278-279 (Ky, 1991). As BrownFoundation notes the definition of "occurrence" says expected of intended "from the standpoint of the insured." The policies could have said from the standpoint of a "reasonable person" or even "from the standpoint an insured," id. p. 279. They did not so the majority rule seems a fair interpretation of the policy language. Morton International, Inc. v. GeneralAccident Insurance Co., 629 A.2d 831, 880 (NJ., 1993) adds an interesting variation to the subjective test which it generally accepts by saying the subjective test can be supplemented by an objective test when "exceptional circumstances justify it." The exceptional circumstances listed by the Morton court include "duration of the discharges, whether the discharges occurred intentionally, negligently or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct and the existence of subjective knowledge concerning the possibility or likelihood of harm," id. page 880. I do not agree with Morton
on other aspects of its decision but the "exceptional circumstance" addition to the subjective test is reasonable. However, it creates analytical confusion I believe to say that when "exceptional circumstances" exist an objective test supplants the subjective test. I believe it is more understandable to say a subjective test applies in these cases but when "exceptional circumstances" such as those listed are proven a prima facie case of subjective intent is made out that the damages were "expected or intended" or perhaps it should be conclusively so presumed.
In any event assuming the subjective test is accepted with the "exceptional circumstances" variation the question still remains what amount of knowledge must the insured have before it can be said that damages (or a polluting act for example) will be expected or intended. As Appleman notes the courts have three different views on that issue. CT Page 8604
At one extreme is the view that the damage is considered expected if it is foreseeable. This restricts coverage the most and City of Carter Lake v. Aetna Casualty Surety Co.,604 F.2d 1052, 1058 (CA8, 1979) seems correct in observing that at least where non-CERCLA damages are involved such a test would only provide coverage in rare instances — "if the damage was foreseeable then the insured is liable, but there is no coverage, and if the damage is not foreseeable there is coverage but the insured is not liable" id. page 1058. cf.City of Johnstown N.Y. v. Bankers Standard Insurance Co.,
977 F.2d 1146, 1150 (CA2, 1989).
The other extreme would give the broadest coverage by construing "expected or intended" narrowly to mean the injury must be specifically intended, Brown Foundation, Inc. v. St.Paul Fire Marine Insurance, 814 S.W.2d at page 278.
City of Carter Lake v. Aetna Casualty Surety Co., supra 604 F.2d at page 1059 states perhaps the better view (it is the only one left after all) that damages are expected when the insured knows or should know that there was a substantial probability of damage from its acts or omissions.[5]
With the rules of interpretation in place, the question remains as to what is meant by "damages." In other words, when we say expected or intended damages what specific damages do we mean? Do we mean the actual damages which form the basis of the claim against the insured or do we refer to some general notion of damage to property or damage to property different from that damage that forms the basis of a claim against the insured and concerning which the insured seeks coverage? Or to put it still another way can an insured still maintain a claim for coverage when certain types of damage were in fact "expected or intended" but the actual damage caused upon which a claim is made is of a type that was neither expected nor intended?
The language of the cases suggest that what is at issue when a court tries to ascertain the meaning of words like "occurrence" or "expected and intended" in the clause defining occurrence is "the availability of any coverage for the claims asserted" by the environmental agency, International Mineralsv. Liberty Mutual Ins. Co., 522 N.E.2d 759, 764 (Ill, 1988). InBrown Foundation v. St. Paul Ins. Co., 814 S.W.2d at pp. 277, a CT Page 8605 case where the court examined the definition of "occurrence" to determine coverage the court said: "The real issue is whether the (defendant) expected or intended all the damage for which the government now seeks redress." In City ofJohnstown N.Y. v. Bankers Standard Ins. Co., 877 F.2d 1146, 1151
(CA2, 1989) the court defined "occurrence" and "expected" and "intended" and said: "Applying these principles of New York law to the facts of this case, it is apparent that the insurers, at least at this stage of this litigation, have failed to show that the extensive environmental damages alleged in the underlying CERCLA action were not accidental." The ultimate cost faced by the insurer is represented by the risk it will have to pay third parties for a particular type of damage. When such a claim is made it does not seem fair to permit the insurer to avoid coverage by permitting it to establish the existence of another type of damage for which no claim has been made. Such an interpretation could lead to a windfall for insurers and be unfair to insureds especially since we are dealing with pollution damage claims about substances whose toxicity is not always clearly known or established and whose danger may vary depending on the particular conditions and setting in which the substance is released. A case like City of Newtown v. Krasnigor,536 N.E.2d 1078 (Mass. 1989), cited by the defendant, in light of these factors is not on point in an environmental pollution case. In Krasnigor the parents of a youth who along with others started a fire were denied coverage by the insurer. The court held that the exclusion from a homeowner's policy for "property damage, . . . which is expected or intended by the insured" applies where there was a showing that the insured deliberately set the fire with the intent of causing some property damage even if the insured did not intend the substantial damage that was ultimately caused, id. at page 1081.
In Krasnigor there was no question that the type of damage claimed by the third party was the type of damage for which the insurer would have provided coverage but for the fact that the damage was intentionally caused by the insured's child. The insured tried to qualify the exclusion by improperly adding to the intent wording of the policy language that restricted its applicability where the amount of damage actually caused was more than the insured actually intended to bring about. If the insurer had not prevailed in Krasnigor it would have been responsible for at least a certain portion of CT Page 8606 a damage claim actually being made.
The reasoning or at least the authorities cited by a case relied on by the defendant in fact seems to support the view the court now takes, Transamerica Insurance Group v. Meere,694 P.2d 181, 184-186 (Ariz. 1984). Meere quotes from Appleman, Vol. 7A, § 4492.01, Insurance Law and Practice:
 The intentional exclusion is necessary to the insurer to enable it to set rates and supply coverage only if losses under policies are uncertain from the standpoint of any single policyholder, and if a single insurer is allowed through intentional or reckless acts to consciously control risks covered by (the) policy, the central concept of insurance is violated.
The court goes on to say that:
 As a matter of contract it seems proper to conclude that the (intentional exclusion) clause is designed by the insurer to exclude indemnification when the insured suffers a loss resulting from the exercise of his (sic) own volition: the exclusion applies because the insured is assumed to have controlled the risk, id. page 186
When toxins or pollutants are involved it cannot be said a priori that the risk of one specific type of damage necessarily implicates a risk of other or all possible types of damage that may be caused by the pollutant.
The bodily injury/property damage clause which contains the word "occurrence" must be read in its entirety and must be read in conjunction with the policies' definition of "occurrence." I think from that reading it is clear that the "bodily injury or property damage" that must be neither "expected or intended" if there is to be coverage is the "bodily injury or property damage" which the insured "shall become legally obligated to pay" — that is the damages that are sought in the suit against the insured.
In determining whether "property damage" is "expected or intended" I do not agree that the nature of the environmental harm is immaterial if the nature of that harm does not form the basis of the bodily injury or property damage claim against the insured. CT Page 8607
An examination of the various communications and orders sent by the environmental authorities to Linemaster indicate the basis of the claim against the company for which it seeks coverage is based on the seepage of pollutants into the groundwater. Also, I believe there is an issue of material fact as to whether Linemaster expected or intended the precise harm of groundwater damage, see Peloquin deposition, Stevens deposition and Handbook for Vapor Degreasing, a manual available to the plaintiff's employees and an instruction manual provided by the degreaser unit manufacturer which was the equipment which would have released the pollutant. Also see Shepard deposition and Swanberg deposition concerning first warnings from the degreaser unit manufacturer and TCE manufacturer as to damages presented by discarding the pollutant.
If I had concluded that under the terms of the policy a "suit" had been filed with an appropriate complaint and the money expenditures imposed on Linemaster by governmental action were "damages" under the terms of the policy, then I would not have sustained the defendant's special defense that no such duty arose because there was no "occurrence." In any event I cannot grant the defendants' cross motion for summary judgment on the basis that it has been shown as a matter of law that there was not an "occurrence."
(4)
From 1979 through 1987 the Aetna policies at issue here contained a so-called pollution collusion clause common to these types of policies. It reads as follows:
 This insurance does not apply: to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere of any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
This language excludes coverage for pollution-related liability except when the cause of the pollution is sudden and CT Page 8608 accidental.
There does not seem to be a great deal of factual dispute between the parties as regards how, under what circumstances and over what period of time pollutants were allegedly released. Very generally put the dispute is over whether given the facts the policy language would apply and who has the burden of establishing the operation of the exclusion. Linemaster argues that "sudden" has no temporal significance, that the effect of the language "sudden and accidental" should be held to mean that coverage is excluded only if the "discharge, dispersal, release or escape" of the pollutants was intentional. Aetna argues that the facts indicate that only a deminimis amount of material can be said to have been released "suddenly", "sudden" does have a temporal significance therefore Linemaster cannot meet its summary judgment burden and indeed Aetna should prevail on its cross motion for summary judgment.
There has been a veritable legion of cases trying to interpret this phrase and it has been said that "the exception to the pollution exclusion for discharges that are `sudden and accidental' is easily the most often litigated part of the standard pollution exclusion."
Insurers started putting this language in CGL policies in 1970, it was developed by the Insurance Service Office in that year and is generally included in every comprehensive general liability policy, Love Canal — Insurance Coverage forEnvironmental Accidents Hurwitz Kohane Insurance Counsel Journal, 7/83, page 378.
In this Aetna policy as noted there is also language which defines the general liability coverage and obligates Aetna to pay certain sums arising out of bodily injury or property damage caused by an "occurrence". "Occurrence" is defined as:
 an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected or intended from the standpoint of the insured.
Language to this effect was included in CGL policies before the pollution exclusion clause just discussed. An CT Page 8609 excellent note in volume 74 Geo LJ p. 1237 (1986) discusses the history of the pollution exclusion clause and the development of judicial interpretations covering it.
It is apparent that the word "accident" is used in the definition of "occurrence" and the word "accidental" is used in the pollution exclusion clause. In a contract every word is to be given a meaning where possible. In or around 1970 CGL policies added a clause excluding coverage for pollution except where a discharge of pollutants was "sudden and accidental." Why was the word "sudden" added and was it meant to have a meaning different from accidental. "Sudden" if it is to have any meaning or purpose and not to be surplusage when used in conjunction with the word "accidental" has to have "a temporal aspect to its meaning and not just the sense of something unexpected," Lumbermens Mutual Casualty Co. v.Belleville Indus. Inc., 555 N.E.2d 568, 571-572 (Mass. 1990).
The latter conclusion has not been universally accepted by courts. But before analyzing the cases and the specific policy language I think it would be helpful to examine the public policy and historical background to the issue now before the court. This will provide a necessary context and background for a discussion of the cases. Even a commentator hostile to the insurers interpretation of the "sudden and accidental" language must admit that: "The insurance industry, in incorporating the pollution exclusion clause into the CGL policy, attempted to limit the interpretation of an `occurrence' to a single accidental event", Applicability ofCGL Insurance For CERCLA Response Costs, 18 Capital University Law Review, 413 at page 423, Hallowes. Why was the suddenness requirement important to insurers, a note in the Georgetown Law Journal says the following:
 The suddenness requirement of accident-based coverage served two purposes. By limiting coverage to accidents distinct in time and place, the suddenness requirement simplified claim administration. It set discrete units to which notice requirements, policy periods, and liability limits applied. More importantly, the insurers designed the suddenness requirement to avoid the "moral hazard" that inhered in insurance coverage for gradual losses. A gradual loss, the insurers thought, could go undetected until it reached catastrophic proportions and, once manifested, often could not be traced to its CT Page 8610 source. By the time the loss was detected, the insured might long since have left the scene. Even if the insured planned on staying, he would be more likely to engage in activity that caused gradual losses if he thought he would never be caught. Thus, the insured would have a greater incentive to pollute if his policy covered gradual losses. The insurer wished to discourage the insured from acting on that temptation. 74 Geo LJ at page 1242.
As the note goes on to say at pages 1252-1253 by introducing the pollution exclusion clause with its "sudden and accidental" language into their policies
 (the) insurers hoped to cut back coverage from the broader definition of occurrence. The general comprehensive liability policy was to cover only damage that did not arise continuously from the normal business operations of the insured. Insurers now make available, at a higher premium, policies that cover gradual environmental contamination. This confirms the intent of the insurers to give the suddenness requirement a temporal meaning. Further, through the pollution exclusion, the focus of the inquiry was shifted from loss to the discharge that leads to the loss. In other words, the insured could not "seek protection from his liability insurer if he knowingly pollute[d]," regardless of the insured's protestation that he did not expect the loss. Nor could the insured recover if the discharge continued over time. Indeed, the wording indicates that even coverage for losses arising from an unknowing and sudden discharge would be barred if the subsequent activity of the pollutants — the "dispersal" — was gradual. The insurers also declared a public policy justification for the pollution exclusion. Industry, it was thought, would have the incentive to improve its manufacturing and disposal processes if coverage was denied.
More to the point as a matter of public policy it is important to foster environmental protection. In order for a strict regime of environmental protection to operate we must have insurers willing and able to assume some of the risks presented to businesses covered by environmental protection laws. Perhaps CERCLA risks never can be covered by private CT Page 8611 insurance as CERCLA is written today but leaving that general problem aside certain things can be said relative to the insurability of such risks. In his article in the Columbia Law Journal he points out in the insurance industry there is a concept known as adverse selection. Adverse selection occurs when applicants for insurance possess substantially more information than insurers about the level of risk applicants for insurance pose. As Professor Abraham goes on to point out, a disproportionate number of high-risk applicants then try to obtain coverage, low risk policyholders drop out of the pool and the cost of coverage rises.
If insurers are to keep functioning in this area where huge CERCLA losses are involved, it is important that they write policies that do not provide coverage for gradual pollution. In the case of gradual pollution insureds are more likely to be able to determine which risk or risks their operations pose and the threat of adverse selection increases. Also, as the professor notes there may be cross-subsidization of insureds whose operations create a special risk of gradual pollution by those who pose only or mainly the risk of sudden and accidental pollution. An insurer whose policies do not contain the pollution exclusion won't be able to compete effectively with insurers whose policies do. Also gradual pollution is more likely to be controllable after it begins but the cost of after the fact identifications of situations in which control was or was not feasible will be high. Thus a policy providing coverage against liability for gradual pollution would not only be subject to a adverse selection but it will result in a diminution in an insured's incentive to avoid loss, see Professor Abraham's article in 88 Columbia Law Review at pages 946, 952-4, 961-962.
Thus, in this court's opinion not only does a plain reading of the policy language support the notion of given a temporal definition to the word sudden, there was a reason the insurers had for including language which achieved that purpose and considerations of public policy beyond the financial interests of the insurance industry support such a result.
What happened in the courts? Several cases, some of which I will discuss, have concluded that the word "sudden" is mere surplusage and have merged the meaning of "sudden and accidental" into the definition of "occurrence." Why have CT Page 8612 they been prompted to do so apart from the legal reasons these courts offer? It is a sad fact that under the strict liability mandates of CERCLA some "blameless" businesses will be destroyed by the expenses the act imposes. This appears to be the real motive behind the judicial rewriting of CGL insurance contracts depriving insurers of the protection they thought policy language gave them. The motive is understandable but for the reasons stated, I believe it is a narrow conception of appropriate public policy.
It is important to analyze those cases which have refused to give explicit temporal significance to the term "sudden" in the pollution exclusion clause. I will review some of them.Avondale Industries, Inc. v. Travelers Indemnity Co.,887 F.2d 1200, 1205 (CA2, 1989) is devoid of reasoning for its position and merely interpreted what it felt to be New York law which according to the court interpreted the clause to merely exclude intentional pollution. Under this holding "sudden" does not mean anything and gradual pollution presents no ascertainable problem which the use of the word was meant to deal with.
Buckeye Union Ins. v. Liberty Solvent Chemical,477 N.E.2d 1227, 1233 (Oh, 1984) is considered a leading case for the insureds' interpretation of the clause. It states that the overwhelming weight of authority supports its position that "sudden and accidental" is merely a reaffirmation or "simply a restatement of the definition of "occurrence" so that the policy will cover claims where the injury was neither expected nor intended. But the "overwhelming weight authority" of cases does not support this view, see InsuranceLaw Practice, Appleman, § 4524.10, page 149. From an historical point of view the position of the Buckeye court also is not supportable. The note in the Georgetown Law Journal indicates that the insurance industry switched over to "occurrence based" coverage in 1966. The industry was dissatisfied with the court interpretations of "occurrence" and the definition of occurrence and added the pollution exclusion clause with its "sudden and accidental" language in 1970, 74 Geo LJ pp. 1246 et seq. The Buckeye court would have us believe the insurance industry in 1970 adopted language in CGL policies to reaffirm court interpretations it disagreed with. The very dictionary references the court cites appear to give "sudden" a temporal significance. The court seems to decide by way of fiat that "sudden" and "accident" or CT Page 8613 "accidental" mean the same thing thus the insurance industry had the bright idea in 1970 to nail down an interpretation of their insurance contracts which it disagreed with and which favored insureds.
I believe the flaw in the reasoning of the Buckeye court is its failure to view the pollution exclusion clause with its "sudden and accidental" language in light of the whole contract including the general coverage language where "occurrence" occurs and "accident" is defined. The court says "sudden and accidental" is not defined in the contract and that makes the pollution exclusion clause ambiguous. But "occurrence" is defined and that definition uses the word "accident" in the definition and not the word "sudden", so one would think the plain meaning of the contract as a whole would require that "sudden" be defined in temporal terms if we start with the basic assumption that words added to a contract are to be given meaning. What I consider the improper approach to contract interpretation is revealed at page 1235 of theBuckeye opinion:
 The term "sudden and accidental" must be construed in its relevant context. The relevant context to be considered is the fact that it is a term employed by an insurer in the contract and should be given the construction most favorable to the insured.
This standard or mode of insurance contract interpretation would not pass muster with our court HeymanAssociates No. 1 v. Insurance Co. of Pennsylvania,231 Conn. 756, 769 (1995). The "relevant context" is not the clause considered in isolation, (although even so confined theBuckeye position is not supportable) — the relevant context is the entire contract for the purpose of contract interpretation.
Remington Arms Co. v. Liberty Mutual Ins. Co.,810 F. Sup. 1406, 1410-1411 (D.Del. 1992) purported to decide how a Connecticut court would interpret the pollution exclusion clause. It referred to three "canons" of interpretation and using these "canons" adopted the view of courts like Buckeye
which hold "sudden" "means `unexpected' and therefore does not possess a temporal element," id page 1411. The first canon the court adopted is that when an insurer sets up a special exclusion for the purpose of withdrawing from coverage a CT Page 8614 specific liability the burden is on the insurer to prove that exception, American Insurance Co. v. Saulmier, 242 F. Sup. 257,259 (D.Conn. 1965), O'Brien v. John Hancock Mutual LifeIns. Co., 143 Conn. 25 (1955). The second canon is that insurance policies are to be construed in accordance with ordinary parlance. The court does not make much use of these two "canons" in its analysis but relies most heavily on its third "canon" which is that an insurance policy "must be construed as a whole, and all of the relevant provisions are to be considered in connection with one another," id. page 1410. In this court's opinion the Remington Arms court then proceeds to ignore this third canon by in effect examining the pollution exclusion clause and its "sudden and accidental" language in isolation from the whole contract. It relies heavily on New Castle County v. Hartford Accident IndemnityCo., 933 F.2d 1162, 1192-1199 (CA3, 1991) notes that court defined "sudden" to mean "unexpected" then goes on to say that "to avoid rendering the term `accidental' mere surplusage by virtue of the court's interpretation of the word `sudden' as meaning `unexpected', the third circuit further held the term accidental meant `unintended'", p. 1411. This gets things exactly backwards since the problem for courts like RemingtonArms, Buckeye and New Castle is to avoid having the word "sudden" be mere surplusage. These courts cannot have it both ways; they cannot merge the meaning of the "sudden and accidental" into the previously accepted definition of "occurrence" but then avoid common sense objections that in the pollution clause "sudden" is not mere surplusage because it means "unexpected." As Appleman points out in Section 4523 page 144 of his work where he discusses the definition of "occurrence" the courts have always agreed that "if damages were expected or unintended then no occurrence takes place, and no coverage exists. The dispute in the courts has been how to apply these terms to the facts of a case."
The New Castle County case raises another issue discussed in some cases by pointing to the position of the industry as to the meaning of the pollution exclusion clause when it was explained to state authorities in 1970, id. pp. 1197-1198. The court says that the fact that "insurers publically marketed the exclusion as a clarification rather than a restriction of coverage further indicates that `sudden and accidental' may mean . . . unexpected and unintended," id. page 1198. Also seeMorton Int'l., Inc. v. General Accident Ins. Co., 629 A.2d 831
(NJ, 1993) cited by Linemaster. New Castle refers to a CT Page 8615 memo issued by the Insurance Review Board (apparently an insurance industry body). Aetna appended to one of its briefs a wealth of material and statements from various state regulations and commissioners that the insurance industry did not make the representations the New Castle court and Linemaster now claims it did. Frankly what makes this aspect of the New Castle opinion unconvincing is that it ignores the historical background previously discussed in being oblivious to the ongoing and much litigated dispute the insurance industry had been waging in the courts over the interpretation of "occurrence based" coverage. The insurance industry had thought that use of the latter language would bar coverage for most cases of pollution because such damages can be expected and intended, see IRB memo reference to in New Castle. Thus, the "occurrence" definition was not intended to cover pollution related losses that were the natural and obvious consequences of the regular operation of a business, 74 Geo LJ page 1248. The courts had given the industry a rude shock however by giving "expected or intended" a narrow meaning, see Appleman, § 4523 at page 144-145. The pollution exclusion clause was another industry attempt by a different means to avoid coverage for gradual pollution which was the natural consequence of the ordinary operation of a business. Theother means was the addition of the word "sudden."
The representations of the industry factor cited by NewCastle County and Morton International presents other problems viewed as a tool for analysis in contract construction cases. How broad is its sweep — do the effect of representations cross state, regional and perhaps national lines? There is no evidence such representations, adverse to their present position, were made in our state by insurers and even if they were that Linemaster relied on them. What is in effect a regulatory estoppel doctrine has not been explicitly recognized in our state. Bouchard v. Travelers, 28 Conn. Sup. 122,125-126 (1969) merely sets forth ordinary waiver and estoppel doctrine. Another basic problem with the New Castle
and Morton court insofar as they rely on purported representations of the insurance industry for an interpretation of the pollution exclusion clause and its "sudden and accidental" language is that I do not find this language ambiguous. I will not go outside contract language to find that otherwise unambiguous contract language should be found to be ambiguous. Besides unless detrimental reliance is shown by a particular insured on these representations, the CT Page 8616 task imposed on the courts would be impossible — should a court conduct hearings on which executive said what, and when he said it, how many agencies had certain representations made to them, will a minimum number suffice, will internal memos of the industry be subject to subpoena, must the drafters be brought to court, is one company bound by the representations of another, should testimony be taken from all insurance companies as to their motives? Fairness would require insurers to defend themselves along these lines since if insurance industry representations are to be used as a basis to find ambiguity, the result of such a finding means the insurers lose their case.[6]
For the reason stated, I find as a matter of law that the word "sudden" in the pollution exclusion clause should be given a temporal significance. Accepting that conclusion I will further assume that for the purposes of discussion the burden rests on the defendant Aetna to establish that exclusion applies. I have read the following exhibits and briefs of the parties relative to this issue: Part 2 of the file, Exhibit 9, Part 4, Exhibits 2, 3 and 8, Part 6, Exhibits C.D. and E. I further examined the Statement of Facts which forms the introduction to the Linemaster brief of January 21, 1994. I also read the depositions of Mr. Carpenter, Johnson, Larose, Peloquin, Shepard, Stevens and Swanberg. I have also examined the affidavits of Ms. Blakely and Mr. Carpenter and Mr. Shepard.
I find that none of the pollution discharges except for a legally insignificant amount were "sudden and accidental" as I have concluded that term should be defined. There were only a few minor unplanned spills. Pollutant discharges occurred gradually over a period of time and were the result of regular business operations.
It is true that courts have found summary judgment inappropriate where the pollution exclusion clause is before a court, Outboard Marine v. Liberty Mutual Insurance,607 N.E.2d 1204, 1222 (Ill, 1992), Joy Technologies v. Liberty MutualInsurance, 421 S.E.2d 493, 500 (W.Va, 1992), Mapco AlaskaPetroleum v. Central National Insurance Co., 795 F. Sup. 941,947 (D.Alaska, 1991). However, these cases all agree with NewCastle and the Buckeye court that "sudden" has no temporal significance and that "sudden and accidental" means unintended and unexpected. Since I believe such an interpretation CT Page 8617 emasculates the pollution exclusion clause and makes it mere surplusage to the occurrence based right to coverage, I conclude that based on the facts presented here summary judgment can be rendered.
(5)
The plaintiff argues that Aetna assumed a duty to defend Linemaster against personal injury claims sustained by a person or organization and arising out of Linemaster's "wrongful entry or eviction or other invasion of the right of private occupancy."
Linemaster argues that EPA and DEP allegations that Linemaster contaminated the groundwater and thereby threatened people's health and property constitute claims of "other invasion of the right of private occupancy." It bases its claim on Titan Holdings Syndicate, Inc. v. City of Keene,898 F.2d 265, 272 (CA1, 1990) and the broad reading of this clause necessitated by its supposed vagueness given by a case likeClinton v. Aetna Life Surety Co., 41 Conn. Sup. 560, 565
(1991), cf Gardner v. Romano, 688 F. Sup. 489 (E.D. Wis, 1988).
Linemaster also maintains the EPA and DEP claims come within the scope of the "wrongful entry" language in the personal injury clause. Linemaster argues that contamination of groundwater that invades another's property constitutes a "trespass or wrongful entry of that person's property." An older case, Platt Brothers Co. v. City of Waterbury,80 Conn. 179, 184 (1907) is not helpful to the plaintiff's position but Linemaster claims "modern" authority supports its view citing Burns v. Lehigh, Inc., 3 CSCR 722 (1988).
Linemaster makes the further argument that the "wrongful entry" and "other invasion of the right of private occupancy" provisions of the personal injury clause "also encompass EPA and DEP claims that sound in nuisance" (5/29/92 brief, p. 47). A Connecticut statute, § 22a-422, states that "pollution of the waters of the state . . . is a public nuisance." Linemaster cites Filisko v. Bridgeport Hydraulic Co., 176 Conn. 33, 37
(1978) where polluted water from a town dump escaped into the plaintiff's pond and part of the evidence used to establish the existence of a nuisance were DEP and Water Resources Commission orders directed to the town to abate the pollution CT Page 8618 from the dump, also see Koystal v. Cass, 163 Conn. 92, 100
(1972) and Dingwell v. Litchfield, 4 Conn. App. 621, 625
(1985).
Based on these arguments Linemaster claims that it is entitled to summary judgment on the issue of Aetna's duty to defend[7]. Reliance on the personal injury clause or endorsement would also have an added advantage for Linemaster since Titan Holdings, supra at page 270 also held the pollution exclusion clause does not affect coverage under the personal injury clause and Red Ball Leasing, Inc. v. HartfordAccident Indemnity Co., 915 F.2d 306, 312 (CA7, 1990) held that there is no "occurrence" requirement under this clause.
Aetna argues that fundamentally different types of coverage are afforded by the CGL coverage portion of the policy and the personal injury endorsement. The first part of the policy provides property damage coverage. The personal injury endorsement is concerned with injuries to the person. It relies on Gregory v. Tennessee Gas Pipeline Co.,948 F.2d 203, 209 (CA5, 1991) which says among other things that it would be inappropriate to extend the application of personal injury coverage to property damage claims which are covered in other portions of the policy and doing so would render the pollution exclusion pointless, id. p. 209. In its 8/21/92 brief several cases are cited supporting the distinction between these two types of claims relative to the applicability of the policy language. Aetna then proceeds to argue that neither the DEP or the EPA really alleged any trespass or nuisance under Connecticut law. In any event, Aetna asks the court to reject the notion that Titian Holdings
stands for the proposition that pollution-related damages can give rise to a claim for trespass which may be covered by the personal injury endorsement. Aetna argues that courts have rejected broad readings of the personal injury endorsement and have rejected finding coverage for allegations of trespass, nuisance or interference with the use of property. There is no evidence here that Linemaster sought to wrest possession from the property owners it might have otherwise injured and one only commits the offense of "wrongful entry, wrongful eviction, or other invasion of the right of private occupancy" when one intentionally claims or interferes with another's possession of real property, Morton Thiokol, Inc. v. GeneralAccident Insurance Co. of America, et al, (NJ Sup. Ct. 3956-85, 1987), Mealy's Litigation Rpts. 4949, 4965. CT Page 8619
Because of my decision as to other matters in this litigation, I need not necessarily reach this question but I believe it is important to give as complete a discussion as possible.
According to one commentator, the law is quite clear on the appropriate interpretation of the personal injury endorsement and would preclude Linemaster's claim that Aetna has a duty to defend under this clause. In Insurance Law Practice, Vol. 7A, § 4501.14 at page 82 Appleman says:
 In coverage for personal injury arising out of "wrongful entry or eviction or other invasion of the right of private occupancy," coverage for "other invasion of the right of private occupancy", is limited to rights associated with a right to inhabit premises not with the right to use them; and it extends only to landlord-tenant situations or other situations in which the plaintiff has a right of occupancy, but the insured has a right of occupancy that is superior.
No action alleged against the plaintiff Linemaster raises a claim that it interfered with the possessory rights or the right of anyone to inhabit their property as opposed to using it.
The case of Decorative Center of Houston, et al v.Employer's Casualty, 833 S.W.2d 257 (Tex. 1992) collects many of the cases. In that case the plaintiff Decorative Center planned to build a commerciaL [commercial] building and purchased insurance from the defendant insurer to protect itself from claims that might arise out of the construction. People named the Bakers owned and occupied a home adjacent to the site and brought suit against the plaintiffs for among other things nuisance, intentional and negligent trespass, and wrongful encroachment. The insurer defended the suit but after a jury verdict for the Bakers claimed it had no responsibility for the jury verdict. The insurer then brought a declaratory judgment action to have its rights and liabilities judicially determined. The trial court granted summary judgment in the insurer's favor and there was an appeal. One of the issues determinative of the appeal was whether Decorative Centers had a right to coverage under the personal injury liability clause. The relevant CT Page 8620 portion of that clause read: "Group C — wrongful entry or eviction or other invasion of the right of private occupancy." The court held that there was no coverage under the policy and said that Decorative Center's
 . . .primary argument is that, because the Bakers' ability to use their property was interfered with, that the interference necessarily constitutes an "other invasion of the right of private occupancy," thus triggering coverage. We do not agree. "Occupancy" normally refers to the state of being inhabited. The right of "private occupancy" can only refer to those rights associated with an individual's act of inhabiting the premises, and not to rights associated with the individual's right to use and enjoy the inhabited premises. The Group C Offenses are meant to cover only landlord-tenant situations, or, if extended, only similar instances where the defendant insured has some superior right of occupancy to that of the plaintiff. Most of the cases from across the country which have interpreted this provision have been either landlord-tenant cases, municipality-property owner cases, or restaurant owner-restaurant-patron cases. All of the cases counsel for appellants cite are landlord-tenant cases or property owner-municipality cases, id. page 261.
See also Martin Brunzelle v. State Farm Fire Casualty Co.,699 F. Sup. 167 (ND Ill, 1988) Beltway Management Co. v.Lexington-Landmark Ins. Co., 746 F. Sup. 1145 (D.D.C., 1990),Hirschberg v. Lumbermans Mutual Casualty, 798 F. Sup. 600 (ND Cal., 1992). For cases involving municipalities see Town ofStoddard v. Northern Security Insurance Co., Inc., 718 F. Sup. 1062
(D.N.H., 1988), Town of Goshen v. Grange Mutual Ins. Co.,424 A.2d 822 (HN, 1980), Titian Holdings Syndicate v. Town ofKeene, 898 F.2d 265 (CA1, 1990), City of Edgerton v. GeneralCasualty Co., 493 S.W.2d 768 (Wis. 1992). Once the landlord-tenant or the municipality-property owner nexus is established some cases give a broader reading than others to the coverage permitted, for example claims of racial discrimination against landlord insured held covered under the clause in Clinton v.Aetna Life Surety Co., 41 Conn. Sup. 560, 565 (1991),Gardner v. Romano, 688 F. Sup. 489, 492 (ED.Wis., 1988), but see Martin v. Brinzelle, 699 F. Sup. 167, 170
(N.D. Ill, 1988).
Thus nothing in Titian or Gardner compel a ruling CT Page 8621 favorable to Linemaster under the facts of this case; Titian
involved a municipality-property owner and Gardner a landlord-tenant. These two relationships are ancillary to a right to coverage under the wrongful entry portion of the personal injury endorsement. Thus, even if cases like Titian orClinton are viewed as stretching invasion of the right of occupancy and thus possession to the limit as to particular types of claim advanced once these ancillary relationships are shown they certainly do not give a right of coverage where the insured as in Decorative Center and here is facing a claim under the personal injury endorsement by a neighboring property owner.
The cases do no specifically articulate a reason for confining coverage under this clause to landlord-tenant or municipality-property owner situations but I suppose it is based on a common sense interpretation of the English language. The clause in its entirety says the personal injury claims arise here out of Linemaster's
 wrongful entry or eviction or other invasion of the right of private occupancy (emphasis added).
The right of private occupancy immediately raises to mind the right of the citizen to maintain his occupancy against interference by the state. Similarly a landlord has imposed on him or her a warranty of habitability vis a vis the tenant — the tenant has private rights of occupancy as against the general right of the landlord to the property. None of these considerations apply here.
There is another reason why this interpretation should be held to be correct. If Linemaster's position is accepted then there seems no point in having the "occurrence" requirement or the pollution exclusion clause in the CGL coverage portion of the policy. The personal injury endorsement does not talk about "wrongful entry" and coverage for injury that may be caused by "wrongful entry." It reads "wrongful entry . . . orother invasion of the right of private occupancy." "Or other" are connective words in our language which serve to make the second part of the phrase function as a modifier of "wrongful entry." "Occupancy" as Decorative Center indicates means the right to inhabit or possession, "private" further qualifies "occupancy" to permit landlord-tenant, municipality-property owner claims to be covered. Pollution damage does not CT Page 8622 interfere with the "right of private occupancy." When the average citizen reads this language coupled with the pollution exclusion clause and the occurrence requirement in the CGL coverage portion of the policy, it would even be clearer that there would be no right of coverage under the personal injury endorsement for the type of harm caused by pollution as claimed in this case.
(6)
Linemaster has also argued that Aetna's second cross motion for summary judgment should be denied because the grounds it relies upon for its position that it has no duty to indemnify were not raised in its denial of coverage letter. Aetna, according to the plaintiff, did not mention the personal injury clause in that letter and did not state it was declining coverage based on the occurrence definition or the pollution exclusion clause.
Aetna factually disputes these claims stating it discussed the definition of occurrence and the pollution exclusion clause in a May 21, 1990 letter and also argues that in one of its briefs Linemaster admits Aetna raised these defenses. Aetna also claims it did not refer to the personal injury endorsement because at that point no claim for pollution coverage under the personal injury endorsement had been made.
These types of factual disputes are important in a waiver case since they go to the question of whether there has been a knowing waiver of rights by the insurer.
However, as a matter of law, waiver cannot be found here so there is no need to resolve these factual disputes or being unable to do so conclude Aetna cannot prevail on its summary judgment motion. In light of earlier decisions in this opinion the waiver argument will only be addressed insofar as it applies as to the pollution exclusion clause and the personal injury endorsement.
Linemaster is certainly correct in asserting that under New York law an insurer "is deemed as a matter of law to have intended to waive a defense to coverage where other defenses are asserted and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances CT Page 8623 regarding the unasserted defense," State of N.Y. v. AmroRealty Corp., 936 F.2d 1420, 1431 (CA2, 1991) (waiver of late notice defense). New York cases support that view, GeneralAccident Insurance Group v. Cirucci, 387 N.E.2d 223, 225 (N Y 1979) as do our courts Danulevich v. Hartford Fire InsuranceCo., 36 Conn. Sup. 570, 576 (1980) (waiver as to notice of accident, opinion by Justice Shea). But we are not dealing here with defenses by the insurer where there is coverage or the right of the insurer to deny coverage where certain preconditions are not met that go to protecting the insurer's rights. The pollution exclusion clause and whether there is coverage under the personal injury endorsement go to the question of whether there is coverage or a contract of insurance at all. As held and fully explained in HeymanAssociates No. 1 v. The Insurance Company of the State ofPennsylvania, 8 Conn. L.Rptr. 440, 444-45 (1993) waiver is not available to bring within the coverage of a policy risks not covered by the terms of the policy or risks that are explicitly excluded, see also numerous authorities cited in that case.
In Hybud Equipment v. Sphere Drake Ins. Co.,597 N.E.2d 1096, 1104 (Oh., 1992) the court said:
 . . . as a general proposition the doctrine of waiver cannot be employed to expand the coverage of a policy . . . This rule has been applied when coverage is expressly excluded under the terms of the policy . . . The doctrine of waiver and estoppel have been applied to rights of the insurer set forth in the policy. These rights may effect whether coverage will be found in a particular situation but cannot define the basic scope of coverage. An example of this is the company's right of timely notification of a possible claim.
 This latter rule is clearly based upon public policy and equity considerations. It is the opinion of this court that these considerations do not warrant the extension of the waiver doctrine to exclusions in the policy. A company should not be obligated to cover a risk for which it did not contract. Therefore (the insurer) did not waive its right to invoke the pollution exclusion by not raising it in its denial letter." (emphasis added). CT Page 8624
The distinction between waiver of so-called conditions of forfeiture by an insurer (certainly recognized) and wavier that would result in the creation or enlargement of the contract of insurance by application of the waiver doctrine is set out in Sections 9083 and 9090 of Insurance Law Practice,
Appleman Vol. 16B. As said in Section 9090
 Insurance contracts cannot be created by estoppel. That doctrine cannot be invoked by an insured to create a primary liability of the insurer for which all elements of a binding contract are necessary
(emphasis added) pp. 576-578.
 It has been repeatedly held that the doctrines of waiver and estoppel cannot be used to extend the coverage of an insurance policy or create a primary liability but may only affect rights reserved therein. While an insurer may be estopped, by its conduct or its knowledge or by statute from insisting on a forfeiture under no conditions can the coverage or restrictions on coverage be extended by waiver and estoppel. pp. 579-582.
There is no claim here that Aetna misled the insured into believing a particular risk was within the coverage by affirmatively so stating through one of its agents or representative, Bill Brown Construction Co. v. Glens FallsInsurance Co., 818 S.W.2d 1, 2, 13 (Tenn. 1991). It would be unfair under those circumstances to allow the insurer to rely on the contract to prove there was no coverage. Nor is this a case where facts have been brought to the court's attention allowing a promissory estoppel argument to be made. TravelersIndemnity Co. v. Holman, 330 F.2d 142, 144, 147, 148, 150-52
(CA5, 1964).
The court does not accept Linemaster's waiver argument for the above stated reasons.
CONCLUSION
In light of the above stated reasoning and conclusions of the court, the plaintiff Linemaster's motion for partial summary judgment on the duty to defend is denied. Aetna' cross motions for summary judgment are granted and the court holds the defendant has no duty to defend and no obligation to CT Page 8625 indemnify under the terms of the insurance policies in this case.
There is no "suit" pending, the action for cleanup and response costs to do not represent "damages" as defined in the policy. Although the court cannot conclude on the basis of what was submitted to it that there is no "occurrence" as a matter of law under the CGL portion of the policy the court does conclude that coverage is barred by the pollution exclusion clause. The court further finds there is no right to coverage under the personal injury endorsement of the policy and that the defendant has not waived its right to deny coverage or any obligation to defend under the pollution exclusion clause or under the personal injury endorsement.